IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Larry D. Scarborough, ) | |
| ) | Civil Action No. 2:11-438-RMG-BHH |
| Plaintiff, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | **OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Lifepoint, Inc., ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the defendant's partial motion to dismiss [Doc. 15], pursuant to Federal Rules of Civil Procedure 12. In his Complaint, the plaintiff alleges that the defendant retaliated against him when it terminated his employment in violation of the clear public policy of the State of South Carolina and that it harassed, and treated him differently, on account of his gender and race. The plaintiff has also pled a claim for aviolation of the Age Discrimination in Employment Act of 1967 ("ADEA"), which the defendant does not challenge. Instead, the defendant has moved to dismiss only the sexual harassment and public policy claims and not the disparate treatment one.[1]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment cases are referred to a United States Magistrate Judge for consideration.

---

[1] The defendant has also sought to strike the plaintiff's prayer for punitive damages. The plaintiff concedes the matter and represents that he has already attempted to omit such references in his Amended Complaint but apparently one such reference remains (see ¶ 43), as a result of a simple oversight. To the extent the plaintiff amends again, pursuant to this recommendation or otherwise, that reference to punitive damages should also be removed. Otherwise, the Court would not recommend or order a new pleading now just for those purposes.

**FACTUAL BACKGROUND**

The defendant is a nonprofit tissue and organ recovery corporation and is, upon information and belief, the only such entity in the State of South Carolina. (Amend. Compl. ¶ 2.) The plaintiff worked for the defendant as a Tissue Recovery Coordinator (TRC) from February 2007, *id.* ¶ 7, until January 16, 2008, *id.* ¶ 29.

In or about December 3, 2007, the plaintiff became ill due to tooth pain so severe that he had to leave work to seek medical attention at an emergency room. *Id.* ¶ 11. The plaintiff was placed on pain medication that made it impossible for him to carry out his job duties. *Id.* ¶ 12. The plaintiff provided documentation to the defendant concerning his inability to perform his job duties. *Id.* ¶ 13. Notwithstanding, the plaintiff contends he was written up for not working. *Id.* ¶ 14.

The Amended Complaint alleges that other employees, who were African-American females, missed work for medical reasons yet were not written or otherwise disciplined. *Id.* ¶ 16, 17. The plaintiff is a white male. *Id.* ¶ 19.

The defendant allegedly has policies about the types of cadavers that can and cannot be used as organ and tissue donors. *Id.* ¶ 11. Among those that allegedly may not be used are individuals weighing more than 350 pounds, who suffered from hepatitis, with tattoos, or who suffered other conditions that could potentially damage the health of the recipient. *Id.* ¶ 21.

In late 2007 or January 2008, the plaintiff alleges to have questioned the harvesting of a heart from a donor who had hepatitis. *Id.* ¶ 22. The plaintiff contends that he was told to harvest the heart anyway. *Id.* ¶ 23. In his charting, the plaintiff noted his reservations about the donor in question and that harvesting the donor's in violation of clear and established employer, and Food and Drug Administration ("FDA"), policies. *Id.* ¶ 24.

On a second occasion, the plaintiff refused to harvest the corneas of a donor who had two "homemade" tattoos that the donor had obtained in the past twelve (12) months.

*Id.* ¶ 25. The plaintiff says that he knew harvesting the corneas would be a violation of company and FDA policy, because he could not verify whether sterile needles had been used for the tattoos. *Id.* ¶ 26. The plaintiff was told to harvest the corneas in spite of this lack of information and, yet, refused to do so. *Id.* ¶ 27. He contends that Vice-President Brenda Horn terminated the plaintiff's employment, on January 16, 2008, with the statements, "you defied my decision," and "it's just time" before walking out of the room. *Id.* ¶ 28, 29.

## APPLICABLE LAW

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)(citations omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state "a plausible claim for relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Stated differently, "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)).

3

**DISCUSSION**

**I.     Hostile Work Environment**

The plaintiff has included hostile work environment allegations in his first cause of action for violation of Title VII. Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Since the environment of the workplace is a term or condition of employment, Title VII creates a hostile working environment cause of action. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To establish a claim for hostile work environment, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on his race or gender; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003); *R & R Ventures*, 244 F.3d at 338; Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997).

The defendant moves for dismissal of this claim insofar as the Amended Complaint contains only a a single hostile work environment allegation, which is purportedly non-specific. (Amend. Compl. ¶ 42.) The plaintiff responds that he has elsewhere in the Amended Complaint alleged a culture in which other employees of different ages, race, or gender were treated non-similarly in regards to their working environment. The plaintiff also emphasizes that even a single severe act can create a hostile environment. Even to the extent both positions of the plaintiff are true, the Court cannot recommend that the claim proceed.

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir.2003) (en banc). First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). It is in this latter respect that the plaintiff's claim, as pled, seems to suffer.

As to the objective severity or pervasiveness of the harassment, it is to be judged from the perspective of a reasonable person in the plaintiff's position. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81(1998). Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir.2006). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive[s] . . . to be abusive.'" *Jennings*, 482 F.3d at 696.

In other words, a hostile work environment typically requires a series or pattern of objectively severe conduct or acts. The plaintiff seems to perceive that his own case does

5

not square neatly with this expectation. And, to that end, he emphasizes, and rightly so, that other jurisdictions have concluded that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) *abrogated on other grounds*. But, many of the cases in which single incidents of harassment were found to have created a hostile work environment have typically involved objectively severe instances of harassment, such as isolated sexual assault or rape. *See Watkins v. Professional Sec. Bureau, Ltd.,* 1999 WL 1032614*,* at *3 (4th Cir. November 15, 1999) (involving an alleged rape); *Tomka*, 66 F.3d at 1305 (involving an alleged rape); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) (allegations of isolated harassment, including a claim of rape, are sufficient to state a claim for hostile environment harassment). Moreover, the United States Supreme Court has emphasized that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. Boca Raton*, 524 U.S. 775, 788, (1998). Some courts have found severe and pervasive conduct in a single incident not involving an egregious sexual assault. *See, e.g., Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 454-57 (8th Cir. 2001) (jury question where during a business trip, a supervisor would not leave Moring's hotel room for several hours, insisted she "owed" him for her job, attempted to kiss her, and touched her thigh).

The plaintiff's Amended Complaint is deficient for having failed to plead anything in satisfaction of the objective test outlined above. Specifically, it does not identify any abusive or hostile language or treatment. (Amend. Compl. at 2-4.) He alleges reprimands and having been written up and ultimately fired. *See id.* But, he does not allege any untoward language or insults or humiliating treatment or statements or other verbal or physical abuse, as is universally required and present in such cases. Even the single event of a write up or

6

the termination of his employment, while adverse, is not the sort of conduct, as detailed above, which constitutes the severely hostile behavior for which the cause of "hostile work environment" is intended to redress. In fact, to make the point, even where such grossly and overt conduct of a sexual nature is present, courts have often declined to identify it as a hostile work environment. *See, e.g., Shaver v. Dixie Trucking Co., Inc.*, 1999 WL 321388, at *3 (4th Cir. May 21, 1999) (concluding that **supervisor placing his hand on plaintiff's knee during her job interview, rubbing plaintiff's back and shoulders and putting his arm around plaintiff several times during her employment** did not rise to the level of severe or pervasive conduct); *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 992-93 (8th Cir. 2003) (holding that acts, consisting of the alleged harasser's **"grabb[ing] [the plaintiff's] buttock" "with force"** and subsequently joking about the incident, did "not rise to the level of severe or pervasive conduct to . . . create an abusive working environment"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998) (determining that supervisor's sexual remark and **deliberate touching of the plaintiff's breasts with papers** were not severe or pervasive to give rise to actionable harassment). It would be a strange result, here, if the plaintiff were to be allowed to correlate an undesirable write-up and termination with the kinds of abusive behavior traditionally required. His averments simply do not satisfy the demands of the objective element of his claim.

Instead, the plaintiff's allegations sound in *disparate*, rather than hostile, treatment, an action different than one for an abusive work place. So, the Court would not find a sufficient set of averments to support a claim for hostile work environment. But, in truth, other than the presence of that phrase, the plaintiff has simply styled his first cause of action as one for a violation of Title VII of the Civil Rights Act. (Amend. Compl. at 2.) That claim, viewed as one for disparate treatment, is sufficient, and the defendant does not challenge

it. The district court, however, should not permit the cause of action to develop as one for hostile work environment.

Precisely for that reason, the Court would not now foreclose the possibility that the plaintiff has simply failed to include incidents of the necessary severity and would allow occasion to move to amend, consistent with the demands of Fed. R. Civ. P. 11. But, this is not an invitation to exaggerate, guess, or wishfully plead. In fact, precisely because the Court is affording this opportunity, under the circumstances, any allegations of abusive conduct now appended to the Complaint, but later found untrue or substantially exaggerated, will be viewed strictly and without typical leniency, upon an examination of whether counsel for the plaintiff has met his Rule 11 responsibilities before the Court. The Court would also, at this juncture, not accept *generalized* allegations of abusive and hostile conduct. But, the plaintiff has leave to move to amend to add any *specific* incidents of conduct, which he has good reason to believe, based on the facts presently in hand, occurred.

## II.    Retaliation/Wrongful Termination in Violation of Public Policy

The defendant also seeks dismissal of the plaintiff's third cause of action for "Retaliatory Discharge." Although maybe a matter of semantics and while the case law does refer in some instances to retaliatory terminations, it is probably more accurate to describe the plaintiff's claim as one for wrongful termination or discharge in violation of public policy. *See  Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 214 (S.C. 1985).

South Carolina recognizes the doctrine of employment at-will. *See Prescott v. Farmers Tel. Coop., Inc.*, 516 S.E.2d 923 (1999); *Shealy v. Fowler*, 182 S.C. 81, 188 S.E. 499 (1936). Under this doctrine, either party may terminate the employment contract at any time, for any reason, or no reason at all. *See Prescott*, 516 S.E.2d at 925; *Baril v. Aiken Reg'l Med. Ctrs.*, 573 S.E.2d 830 (S.C. Ct. App.2002). South Carolina courts, however,

have carved out exceptions. *See Small v. Springs Indus.*, Inc., 388 S.E.2d 808 (1990) (Small II ); *Davis v. Orangeburg-Calhoun Law Enforcement Comm'n*, 542 S.E.2d 755 (S.C. Ct. App. 2001).

One such exception arises when the discharge of an at-will employee constitutes a violation of a clear mandate of public policy. *See  Ludwick*, 337 S.E.2d at 214; *see also Lawson v. S.C. Dept. of Corrections*, 532 S.E.2d 259, 261 (S.C. 2000); *Barron v. Labor Finders of South Carolina*,682 S.E.2d 271, 274 (S.C. Ct. App. 2009) (emphasizing that Lawson limited claims of wrongful discharge in violation of public policy to those situations where an employee was asked to violate the law or where the termination violated criminal law).

Although not definitively so, the exception has been narrowly available, typically, only "when an employer requires an employee to violate the law or the reason for the employee's termination was itself a violation of criminal law." *Lawson v. S.C. Dept. of Corrections*, 532 S.E.2d 259, 261 (S.C. 2000); *Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 637 (S.C. 2011). But, the exception does not extend to situations where the employee has an existing statutory remedy for wrongful termination. *See Dockins v. Ingles Markets, Inc.*, 413 S.E.2d 18 (1992) (employee allegedly terminated in retaliation for filing complaint under Fair Labor Standards Act had existing statutory remedy for wrongful termination).

The plaintiff contends that he was required by the defendant to violate the 1984 National Organ Transplant Act, a federal statute. He does not anywhere contend that the termination itself was somehow a violation of criminal law.

The defendant initially argues that the plaintiff has premised his claim on a violation of company, rather than public, policy. This seems precisely right. The Amended Complaint purports to suggest that the plaintiff was forced to act in contravention of the public policy as established in the National Organ Transplant Act that organs not be harvested from individuals weighing in excess of 350 pounds, bearing homemade tattoos,

9

or suffering from hepatitis. Upon closer examination, the plaintiff has built a too tenuous connection between any federal statute and having been allegedly forced to violate the law.

Specifically, the plaintiff has identified only one statutory provision. 42 U.S.C. § 273(b)(3)(c) states that "qualified organ procurement organizations" (of which the defendant is one) shall:

> arrange for the acquisition and preservation of donated organs and provide quality standards for the acquisition of organs which are consistent with the standards adopted by the Organ Procurement and Transplantation Network under section 274 (b)(2)(E) of this title, including arranging for testing with respect to preventing the acquisition of organs that are infected with the etiologic agent for acquired immune deficiency syndrome . . . .

42 U.S.C. § 273(b)(3)(c). The plaintiff contends that in light of this statutory mandate the defendant promulgated certain non-specified policies that forbade the harvesting of organs from individuals weighing more than 350 pounds, individuals who suffered from hepatitis and individuals with tattoos and other conditions that could potentially damage the health of the recipient. The plaintiff contends that he was asked to violate these company policies.

There are two problems. The first is that the company policies under no circumstances could ever be considered a "law" that the plaintiff was required to violate. They are not an expression of rights and responsibilities, legislatively enacted, enforceable in our justice or administrative systems. And, the plaintiff has offered no authority to explain how a violation of the company policy could ever be viewed as a violation of Section 273. There are hardly any cases even concerning the interplay between the two. A failure of a qualified organ procurement organization to promulgate policies pursuant to the statute might constitute a violation of law by *that organization*, but a downstream failure of a third-party to abide the policies adopted is not itself any sort of violation of the statute.

So insofar as the State of South Carolina has said that it is a violation of public policy to terminate employment for having refused to violate the *law*, the plaintiff has not pled any law, which he might have violated at the defendant's direction. His Amended Complaint,

on its face, admits of this deficiency. The Amended Complaint, nor the plaintiff's subsequent argument in its defense, have identified a single provision of the National Organ Transplant Act, which the plaintiff could have possibly violated.

Second, the statute in question is not criminal as far as the Court can tell. In fact, the plaintiff has not identified any penalties or fines, criminal or civil, to which the procurement organizations may be subject (although they may well exist). Of course, the decisions in this regard are not uniform – whether or not the law in question must be criminal. Many simply refer to instances when an employer "requires an employee to violate the law . . .," without any express civil or criminal qualification. *See Barron, 713 S.E.2d at 637; Southern Glass & Plastics Co. v. Duke*, 626 S.E.2d 19 (S.C. Ct. App. December 12, 2005); *Lawson*, 532 S.E.2d at 261; *Nolte v. Gibbs Intern., Inc.*, 515 S.E.2d 101 (S.C. 1999). Others have expressly stated that the law the employee is threatened with violating must be criminal. *Antley v. Shepherd*, 532 S.E.2d 294, 297 (S.C. Ct. App. May 22, 2000); *Keiger v. Citgo, Coastal Petroleum, Inc.*, 482 S.E.2d 792 (S.C. Ct. App. February 18, 1997).

The Court is of the view that the public policy claim is not limited to instances where the plaintiff is fired for refusing to violate a criminal law only. The oldest and most seminal decisions of the Supreme Court not only fail to include this modifier but its absence stands in contrast to the specific decision of the Supreme Court to, in typically the very next clause, indicate that the public policy claim is also available where the termination itself is a violation of "the criminal law." *See Barron*, 713 S.E.2d at 637. For example, *Barron* reads as follows:

> The public policy exception clearly applies in cases where either: (1) the employer requires the employee to violate the law, *Ludwick, supra*, or (2) the reason for the employee's termination itself is a violation of criminal law.

Where the Court uses a word in one instance and not elsewhere, especially in such close proximity, it is reasonable to assume the omission was purposeful.

11

But, our District has tended to conclude the opposite – that the plaintiff must be threatened with violating *criminal* law. *See, e.g., Greene v. Quest Diagnostics Clinical Laboratories*, Inc., 455 F. Supp. 2d 483, 489 (D.S.C. 2006) ("Because plaintiff has not alleged that she was required to violate a criminal law or that her termination itself was in violation of a criminal law, her claim does not fit within the currently recognized bounds of the public policy claim."); *see also Washington v. Purdue Farms, Inc.*, 2009 WL 386926, at *12 (D.S.C. 2009) (dismissing public policy claim where employer purportedly denied employee's request for FMLA leave, which neither violated a criminal law nor required the employee to do so); *Eady v. Veolia Trans., Serv. Inc.*, 609 F. Supp. 2d 540, 559 (D.S.C. 2009) (where the plaintiff claimed that he was terminated for refusing to sign a blank affidavit the Court held "because the plaintiff has not alleged that he was required to violate a criminal law or that his termination was in violation of a criminal law, his claim does not fall within the public policy exception")

To the Court, the condition of this cause of action under South Carolina state court precedent is less than desirable. It is not the Court's first jaunt through it and there simply remains too much ambiguity. The language employed is typically inconsistent, and the courts have simultaneously circumscribed the cause of action while in the same breadth teased that more is available. To highlight the confusion on this issue alone, in *Miller v. Fairfield Communities Inc.*, 382 S.E.2d 16 (Ct.App.1989), the South Carolina Court of Appeals "[chose] not to expand the public policy exception to include" situations where an employer subjects an employee to *civil sanctions* as a condition of retaining employment. *Id.* 382 S.E.2d at 19. In *Garner*, the South Carolina Supreme Court seemed to reopen the possibility. *See* Garner, 456 S.E.2d at 226. Subsequently, *Barron* reiterated its narrow limits. *Barron*, 682 S.E.2d at 274 (emphasizing that Lawson limited claims of wrongful discharge in violation of public policy to those situations where an employee was asked to violate the law or where the termination violated criminal law).

12

Ultimately, the Court, feels constrained, based on some indication in South Carolina law and the prior decisions of this District to recommend that the statute is also ineffective to support a public policy claim because it is not a criminal statute. The Court does so only because the first ground – that the only actual or potential violation was of company policy – is seemingly so effective to resolve the matter and, out of an abundance of caution, for the eventual decision of the district court. The undersigned, however, reserves the opportunity to recommend differently in future matters where the issue is more material to the outcome.[2]

Accordingly, the plaintiff has not identified any law, criminal or otherwise, which he was asked to violate. He has, instead, identified corporate policies, which do not reflect the

---

[2] As an additional argument, the defendant also seems to contend that the public policy must find its origins in state, rather than federal, law. Specifically, the defendant contends that the termination itself was not any sort of crime and that the plaintiff was not "required to violate South Carolina law." (Def. Mot. Dismiss at 8.) The Court has not identified any case suggesting that it must be state law the employee is required to violate before a public policy claim may stand. In fact, this sort of interpretation appears to invert the analysis.

It is true that some of the case law speaks in terms of wrongful discharge that is in violation of a clear mandate of public policy of the State of South Carolina. But, that is the ten-thousand foot view of the legal concept. The courts have put contour on that umbrella phrase by saying the public policy of the State of South Carolina *means*, in these instances, that no employee should be forced to violate the law, ostensibly of any kind, not just South Carolina law. That *is* the reflection of the public policy of the State – freedom from coerced lawbreaking. It is an additional, and the undersigned thinks, an out-of--step interpretation of the precedent, to reapply the requirement again, that the law potentially violated also be South Carolinian in quality, for the action to stand. The language is unqualified: where an employee is forced to violate the *law*, an action lies. *See Barron*, 713 S.E.2d at 614. By way of hyperbole, nothing in the case law indicates that it would not be a violation of South Carolina public policy for an employer to demand that an employee kidnap a child and transport it across state lines in violation of the federal Parental Kidnapping Prevention Act (obviously there exists a state prohibition on kidnaping, albeit not in regards to interstate trafficking). The public policy consideration seems to be that the employee not be faced with the consequences of violating the law, whatever the source. In terms of the predicament foisted upon the employee, as between whether to follow the law or obey his boss, it is immaterial to him whether or not the law to be followed has its source in state, federal, or international polity because, so long as the employee is subject to its reach, the employee is wrongly compromised in his work and relationship with the employer. Other courts have seemed to agree that their respective and comparable state actions in public policy could be grounded in federal statute. *See, e.g., Lee v. Denro, Inc.*, 605 A.2d 1017, 1021 n.2 (1992) ("We assume without deciding that an employee can base a claim for wrongful discharge under Maryland law on an asserted violation of public policy exhibited by violation of federal statutes.") Nothing in the case law of South Carolina would suggest to the Court differently.

Ultimately, the issue is mooted by virtue of the Court's recommendation that the plaintiff has not pled any grounds upon which it can be concluded that he was forced or required to break any law, criminal or civil, federal or state. Company policy, by the Complaint's own admission, is the only proffered "law," which attempts to justify the claim.

13

sort of public concern contemplated by South Carolina courts for purposes of a wrongful discharge claim. For this reason, the claim should be dismissed.

The defendant has made other arguments related to the facts surrounding its instruction to the plaintiff in regards to these same policies. The Court would not recommend dismissal on account of them because they reasonably include all manner of fact issues, which the face of the Amended Complaint does not foreclose one way or the other. For the other reasons already identified, however, the claim should nevertheless still be dismissed.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is RECOMMENDED that the defendant's motion to dismiss [Doc. 15] should be GRANTED in part and DENIED in part. Specifically, the defendant's motion as to the plaintiff's hostile work environment claim should be DENIED. The plaintiff should be afforded fifteen (15) days from the district court's decision concerning this recommendation to amend his Complaint. Otherwise, the hostile work environment portion of the first cause of action should be dismissed. In any case, the disparate treatment language of that same action remains effective. The plaintiff's retaliation claim, however, should be DISMISSED in its entirety, and the defendant's motion GRANTED in that respect.

                                                s/Bruce H. Hendricks
                                                United States Magistrate Judge

October 28, 2011
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).